Mandziej v. SSA                          CV-95-444-M    09/24/96 P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


John Mandziej,
        Plaintiff,

        v.                                      Civil No. 95-444-M

Shirley S. Chater, Commissioner
of Social Security Administration,
        Defendant.


O R D E R


Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), John Mandziej seeks review of a final decision by the Commissioner of Social Security Administration, denying his application for Social Security benefits.  Before the court is plaintiff's motion to reverse the decision of the Commissioner.  The Commissioner objects, and moves to affirm that order.  For the reasons set forth below, plaintiff's motion is denied and the Commissioner's order is affirmed.


I.  **FACTS**

Pursuant to the court's local rule 9.1(d), the parties have submitted a joint statement of material facts, which provides as follows:

## A. <u>Medical Evidence</u>

In 1994, John Mandziej was 47 years old and had previously worked as an auto service advisor and a sales representative in the communications industry. (Tr. 41, 54). He sold automotive services from 1980-81 and communication services from 1985-90. (Tr. 41, 57). He stopped working in 1990 allegedly due to chronic back pain and has not been employed since. (Tr. 42-43). Plaintiff has a college degree. He is single and has no dependents.

In 1991, Blake Thompson, M.D. examined and treated Mr. Mandziej for his back impairment. (Tr. 101-115). In his February 20, 1991 office notes, Dr. Thompson stated that plaintiff complained of daily pain in the left hip and buttock region, which had been present for several months. (Tr. 104). This pain was exacerbated by prolonged walking, prolonged sitting, prolonged standing, lifting, and riding in a car. (Tr. 102, 104). The pain was lessened when he lay down or when squatting or doing back exercises. (Tr. 101, 104). Examination of plaintiff revealed decreased lumbar lordosis[1] and moderate

---

[1] <u>Lordosis</u> - An abnormal deformity: anteroposterior curvature of the spine, generally lumbar with the convexity looking anteriorly. <u>Stedman's Medical Dictionary</u> (Stedman's), 24th Ed.

tenderness to palpation in the left lower iliolumbar region. (Tr. 105). Plaintiff had essentially normal reflexes, strength, sensation, and range of motion. (Tr. 105-106). Further, plaintiff's Babinski's sign[2] was negative, as was his straight leg raising. (Tr. 106). X-rays of plaintiff's lumbar spine revealed a five-segment lumbar spine with the intercristal[3] line through the L4-5 interspace and a Grade II spondylolisthesis[4] at L5-1. (Tr. 106). Dr. Thompson diagnosed plaintiff with a Grade II spondylolisthesis of L5-S1 with degenerative disc disease and possible nerve root impingement and left-sided iliolumbar strain syndrome.[5] (Tr. 107). Dr. Thompson prescribed Motrin 800 mg. three times per day and a trunk stability program to decrease stress on the spine. (Tr. 107). He did not recommend surgery.

---

(1982), p. 810.

[2] Babinski's sign - The loss or lessening of the Achilles tendon reflex in sciatica; this distinguishes it from hysterical sciatica. See Dorland's Illustrated Medical Dictionary (Dorland's), 28th ed. at p. 1521.

[3] Intercristal - Between two crests, as between the crests of the ilia, applied to one of the pelvic measurements. Stedman's at p. 716.

[4] Spondylolisthesis - The forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it or upon the sacrum. Stedman's at p. 1322.

[5] Iliolumbar - Pertaining to the iliac and lumbar regions, or to the flank and loin. Dorland's at p. 650.

3

On March 1, 1991, plaintiff reported improvement in his condition with physical therapy and Motrin. (Tr. 108). He did, however, still experience mild tenderness to palpation over the left iliolumbar region. (Tr. 108). On March 15, 1991, Plaintiff again reported improvement in his condition with continued physical therapy, home exercises, and Motrin. (Tr. 109). Dr. Thompson reviewed plaintiff's x-rays and observed spondylosis[6] at L5-Sl with spondylolisthesis. (Id.). Dr. Thompson recommended that Plaintiff obtain a lumbar support pillow for use while sitting. (Tr. 109). Also, on that date, Dr. Thompson completed a form stating that plaintiff was disabled due to lumbar strain with spondylolisthesis. He noted, however, that plaintiff should be able to return to his usual work in May 1991. (Tr. 150).

On March 22, 1991, plaintiff reported severe back pain which radiated into his hips and extended down his legs. (Tr. 110). Physical examination revealed tenderness to palpation in the lumbar paraspinal muscles and buttocks area and pain with straight leg raising. (Tr. 110). Dr. Thompson noted that plaintiff was not performing his trunk stability exercises

---

[6] Spondylosis - The degenerative narrowing of the spinal canal. N.Y.U. Dept. of Neurosurgery W.W.W. (3/4/96).

properly.  He recommended changes to Plaintiff's physical therapy program and prescribed Medrol Dosepak, Motrin, and a lumbosacral support.  (Tr. 110).  Plaintiff returned on March 29, 1991 to see Dr. Thompson and reported that his condition was greatly improved and that he was experiencing much less pain.  (Tr. 112).  Dr. Thompson continued treatment with physical therapy, home exercises, and Motrin.  (Tr. 112).

In April 1991, Dr. Thompson reported that Plaintiff continued to improve but still had significant discomfort in his back.  (Tr. 113).  His regimen of treatment continued as before. He was given approval to seek treatment with a chiropractor as long as he did not undergo any forceful manipulation because of his spondylolisthesis.  (Tr. 113).

On April 22, 1991, plaintiff began receiving treatment from Mark W. Stagnone, a chiropractor.  (Tr. 114).  At his initial examination, Dr. Stagnone found that plaintiff had some limitation of motion in his back and some spasm, but otherwise Dr. Stagnone's findings were essentially normal.  (Tr. 128-130). Dr. Stagnone began seeing plaintiff one to two times per week.

5

Finally, in May 1991, plaintiff was reevaluated by Dr. Thompson. (Tr. 114). At that time he was counselled on proper exercise programs and told to engage in an aerobic exercise program and a back stabilization program. (Tr. 114). Dr. Thompson stated that at that point, plaintiff would only be followed on an as-needed basis. During the period plaintiff was treated by Dr. Thompson, he received physical therapy on 21 occasions at Southwestern Physical Therapy for his back pain. (Tr. 116-127).

Dr. Robert A. McPherson completed a certificate of disability for plaintiff on May 23, 1991, and noted that plaintiff had low back pain with sciatica. According to Dr. McPherson, plaintiff would be disabled through July 23, 1991, at which time he would be able to return to his former work. (Tr. 151).

From May through September 1991, plaintiff continued visit Dr. Stagnone for chiropractic manipulation. (Tr. 130). Progress notes from those sessions show that plaintiff continued to complain of pain in his lower back, but noted some improvement from the chiropractic exercises. Dr. McPherson completed another

disability certificate for plaintiff on October 21, 1991. (Tr. 152). At that time, Dr. McPherson stated that plaintiff's condition had improved but, if he stood for more than two hours, he would become incapacitated by pain and would have to lie down for an extended period of time. Dr. McPherson opined that plaintiff would be disabled until December 1, 1991, at which time he could return to his former work. (Tr. 152).

Plaintiff continued to be seen by Dr. Stagnone for chiropractic manipulation from October 1991 through December 1991. (Tr. 130-131). Progress notes from those sessions show that plaintiff continued to complain of pain in his lower back, but noted some improvement from the chiropractic exercises.

Dr. McPherson apparently treated plaintiff from April 1991 to March 1992.[7] (Tr. 129-132). His progress notes document treatment for pain, tenderness, and spasm in the low back region because of plaintiff's spondylolisthesis. (Tr. 129-132). Plaintiff was treated for a dislocated left elbow in December

---

[7] The Exhibit List in the transcript (Tr. 1) indicates that the medical records in the transcript at pages 128-135 are from Dr. Stagnone. A closer look at these pages suggests that pages 129-132 were from Dr. McPherson and pages 128, 133-135 were from Dr. Stagnone, a local chiropractor in Nashua, New Hampshire.

7

1991, (Tr. 136-138), which he claims was caused by a fall that was precipitated by the instability of his back condition. (Tr. 159).

Plaintiff resumed treatment with Dr. Stagnone from September-October 1993. (Tr. 128, 133-135). Dr. Stagnone's initial office notes from this period record plaintiff's complaints of pain, especially during periods of sitting or standing. (Tr. 128). He also noted that plaintiff reported that pain medication was only effective when he took it for sciatic pain. (Tr. 128). On September 14, 1993, Dr. Stagnone wrote that physical examination revealed objective evidence of continued lower back problem. (Tr. 135). In Dr. Stagnone's professional opinion as a chiropractor, plaintiff's condition continued to impair his ability to pursue gainful employment. (Tr. 135). Dr. Stagnone subsequently provided a radiographic report in which he found Grade II spondylolisthesis L5, moderately advanced lumbar disc degeneration L5-S1 without evidence of spondylitic changes and left rotatory lumbar scoliosis with associated pelvic imbalance. (Tr. 134).

At Social Security's request, Ralph Wolf, III, M.D. performed a consultative examination on plaintiff in December 1993. (Tr. 139-140). He noted plaintiff's complaints, including pain of three years' duration which was incompletely relieved with bracing, chiropractic manipulation, and physical therapy. (Tr. 139). Upon examination, Dr. Wolf found that plaintiff had no lumbar deformities and could perform straight leg raises. (Tr. 139). Additionally, he noted that plaintiff's sensation, motor function, and reflexes were intact. X-rays of the lumbar spine revealed mature, Grade II, L5-Sl spondylolisthesis. (Tr. 139). Dr. Wolf diagnosed plaintiff's condition as L5-Sl spondylolisthesis with sciatica (Tr. 139), but he opined that plaintiff could perform any sitting or driving work with a mild amount of walking. (Tr. 139). He did, however, believe that plaintiff was permanently disabled from any heavy manual labor. (Tr. 140). Finally, Dr. Wolf indicated that, despite any future treatment, plaintiff's condition was unlikely to change (Tr. 139), and, therefore, he should begin training for sitting work. (Tr. 139).

On December 28, 1993, Dr. Munro Proctor performed a residual functional capacity assessment. (Tr. 63-70). He found that,

despite plaintiff's pain and X-ray evidence of spondylolisthesis, he could occasionally lift 20 pounds, frequently lift 10 pounds, and could sit, stand and walk, each for up to 6 hours. (Tr. 64, 70). While plaintiff could not repetitively reach, his ability to push and pull was unlimited, and he could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 64-66). No other limitations were noted. (Tr. 66-67). That assessment was affirmed in its entirety by Dr. A.C. Campbell in February 1994. (Tr. 70, 75).

## B. Hearing Testimony

### 1. Claimant

Plaintiff appeared at his November 29, 1994 hearing without counsel (Tr. 31, 33) and chose not to be represented after being questioned by the ALJ. (Id.). He testified that he was unable to work because he experienced severe continuous pain from lack of stability in his lower back. (Tr. 44). He described the pain as a sharp, stabbing pain that would run down his leg. On other occasions, the pain was hot or dull. He described the pain as being at a toothache level of severity, and said that it was intensified by sitting or standing. (Tr. 44). Plaintiff testified that his most comfortable position was sitting with his

10

legs above his head because it seemed to cut down on the pressure in his lower back. (Tr. 50). His sleep was disrupted by the pain and this prevented him from keeping on a schedule. (Tr. 44). He took Ibuprofen (Motrin) but it didn't seem to have much affect on his pain. (Tr. 46).

His daily activities included cooking with a microwave. (Tr. 47). He also did his own housecleaning and food shopping. He used a self-propelled lawn mower to cut his grass and purchased a snowblower to handle the snow shoveling. Plaintiff indicated that because of his impaired sleep habits, he would get up in the morning around 11:30 a.m. (Tr. 48-49). He would use some traction equipment, and in the afternoon he would often (4-5 times per week) go to a gymnasium and perform some exercises including leg presses. (Tr. 49). This helped to temporarily relieve him of pain. (Id.). He had previously been walking for exercise but had switched to swimming. (Tr. 51). Most of the day he spent lying down or sitting with his feet up. (Id.).

### 2. **Vocational Expert**

A vocational expert testified at plaintiff's hearing. He noted that plaintiff's prior relevant jobs as a sales

11

representative in the communications industry and as an auto service advisor were skilled jobs that involved a light level of exertion. (Tr. 54). In a hypothetical, the ALJ asked the vocational expert to assume that someone was able to lift and carry objects up to 20 pounds during the day and had a job which did not require frequent bending at the waist to pick up objects off the floor. Additionally, he was asked to assume that frequent overhead reaching was restricted, as were bending, stooping, crouching and crawling. This person could work in a sitting or standing position which might include short amounts of walking. However, he or she would need to be able to change positions from time to time. With these assumptions, the ALJ asked the vocational expert if this person could perform plaintiff's prior work. The vocational expert responded that such a person could perform the auto service advisor job but not necessarily the sales representative job because of the substantial amounts of driving involved. (Tr. 55-56). In response to the ALJ's hypothetical involving a person who would have to lie down on a fairly regular basis during the work day or at least be in a sitting position with his or her feet up on a table, the vocational expert testified that such a person would

12

not be able to perform plaintiff's prior jobs or any other type of skilled or unskilled work.  (Tr. 56).

## II.   **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." Factual findings of the Secretary are conclusive if supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).[8]

In making those factual findings, the Secretary must weigh and resolve conflicts in the evidence.  Burgos Lopez v. Secretary of Health & Human Servs., 747 F.2d 37, 40 (1st Cir. 1984) (citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)).  It is "the

---

[8] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966).

responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the Secretary, not the courts." Ortiz, 955 F.2d at 769 (citing Rodriguez, 647 F.2d at 222). And, the court will give deference to the ALJ's credibility determinations, particularly where those determinations are supported by specific findings. Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing Da Rosa v. Secretary of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)).

An individual seeking Social Security disability benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). The Act places a heavy initial burden on the plaintiff to establish the existence of a disabling impairment. Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the plaintiff must prove that his

14

impairment prevents him from performing his former type of work. Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of Health and Human Servs., 690 F.2d 5, 7 (1st Cir. 1975)). Nevertheless, the plaintiff is not required to establish a doubt-free claim; the initial burden is satisfied by the usual civil standard, a "preponderance of the evidence." See Paone v. Schweiker, 530 F. Supp. 808, 810-11 (S.D. Miss. 1982). In assessing a disability claim, the Secretary considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience. See, e.g., Avery v. Secretary of Health and Human Servs., 797 F.2d 19 (1st Cir. 1986); Goodermote, 690 F.2d at 6.

Once the plaintiff has shown an inability to perform his previous work, the burden shifts to the Secretary to show that there are other jobs in the national economy that he can perform. Vazquez v. Secretary of Health and Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). If the Secretary shows the existence of other jobs which the plaintiff can perform, then the overall burden

15

remains with the plaintiff.  <u>Hernandez v. Weinberger</u>, 493 F.2d 1120, 1123 (1st Cir. 1974); <u>Benko v. Schweiker</u>, 551 F. Supp. 698, 701 (D.N.H. 1982).  Ultimately, the Secretary of Health and Human Services will find a plaintiff disabled only if the plaintiff's:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2)(A).

With those principles in mind, the court reviews plaintiff's motion to reverse the decision of the Secretary.

## III.  <u>DISCUSSION</u>

In concluding that Mr. Mandziej was not disabled within the meaning of the Act, the ALJ utilized the mandatory five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920 (1995).[9]  Step 4 of the evaluation process requires the

---

[9] The ALJ is required to make the following five inquiries when determining if a claimant is disabled:

> (1) whether the claimant is engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment;

16

ALJ to determine whether, despite the plaintiff's impairment, he retains the residual functional capacity ("RFC") to perform his past relevant work. At step 4, the ALJ determined that Mandziej had the residual functional capacity to perform the exertional and nonexertional requirements of light work and, therefore, could perform his past relevant work as an automobile service advisor. (Tr. 20). Accordingly, the ALJ concluded that Mandziej was not disabled within the meaning of the Social Security Act.

Plaintiff, who appeared before the ALJ unrepresented by counsel, first argues that his waiver of the right to have counsel present was neither knowing nor voluntary. Additionally, he advances three interconnected arguments in support of his claim that the ALJ's denial of disability benefits is not supported by the evidence. Specifically, he claims: (1) the ALJ failed to fully develop his claim for disability benefits; (2) the ALJ did not set forth specific findings regarding plaintiff's

---

(3) whether the impairment meets or equals a listed impairment;
(4) whether the impairment prevents the claimant from performing past relevant work; and
(5) whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520.

17

past relevant work; and, (3) the ALJ failed to properly weigh plaintiff's regimen of treatment.  Each of these alleged errors took place at Step 4 of the ALJ's five-step sequential analysis.

### A.    Lack of Representation by Counsel

Plaintiff suggests, without actually expressly stating, that his waiver of the right to counsel at the hearing was ineffective.  See Plaintiff's Memorandum at 11, n. 5.  Claimants for Social Security disability benefits have a statutory right to counsel at hearings.  See  42 U.S.C. 406; see also 20 C.F.R. 404.1705.  However, the right to counsel "falls well below the Sixth Amendment threshold" applicable in criminal cases. Evangelista v. Secretary of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  As part of the right to counsel, claimants should be appropriately notified of that right. Claimants may, following sufficient notification of the right to counsel, waive the right by intelligently deciding to proceed pro se.  See Evangelista, 826 F.2d at 142; see also Edwards v. Sullivan, 937 F.2d 580, 585-86 (11th Cir. 1991); Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990); Holland v. Heckler, 764 F.2d 1560, 1562-63 (11th Cir. 1985).  And, "a flaw in the notice does not automatically require that the case be remanded.

18

Rather, claimants must also show that they were prejudiced by their lack of representation." Marsh v. Secretary of Health and Human Servs., slip op., 1994 WL 587803 (D.N.H. Oct. 25, 1994).

Here, plaintiff has failed to demonstrate that his waiver of the right to be represented by counsel was any less than knowing and voluntary. Nor has he demonstrated any actual prejudice stemming from his lack of legal representation. Plaintiff, who is college-educated, was repeatedly notified of his right to counsel and told of the advantages of having counsel present at the hearing. (Tr. 24, 28, 29, 71, 77). The waiver of counsel at the beginning of the hearing was informed and effective.

## B.  **Development Of The Record**

Although the burden is initially on the claimant to prove he is unable to perform his previous work, when a claimant is unrepresented, the ALJ has a heightened duty to develop the record. Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991); see also Carillo Marin v. Secretary of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985); Currier v. Secretary of Health, Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980). The ALJ must develop the record with specific information and without

19

evidentiary omissions.  Upon reviewing that record, the court must determine "whether the [alleged] incomplete record reveals evidentiary gaps which result in prejudice to the plaintiff." Gauthney v. Shalala, 890 F. Supp. 401, 410 (E.D. Pa. 1995).  If the ALJ fails to fill those evidentiary gaps, and if they prejudice plaintiff's claim, remand is appropriate.  (Id.).

Here, plaintiff argues that the ALJ did not adequately develop the record to reflect all of the relevant facts and evidence.  Plaintiff's Memorandum at 11-17.  He claims that this resulted in evidentiary gaps that undermined his credibility.

First plaintiff disputes the ALJ's assessment of his RFC, arguing that the ALJ did not extensively question him regarding the specifics of his daily activities and the exertional requirements of his past jobs.  In determining a claimant's RFC, the ALJ must consider tasks that can be performed despite a claimant's physical or mental limitations.  20 C.F.R. § 404.1545. So, the ALJ will evaluate medical, physical, and mental factors; plaintiff's descriptions of his impairments and limitations; relevant medical evidence; and other relevant evidence.  Avery, 797 F.2d at 25-30; Evangelista, 826 F.2d at 144.  However, the

20

burden remains with the claimant to prove he is unable to return to his previous work. "[N]ot only must the claimant lay the foundation as to what activities [his] former work entailed, but [he] must point out . . . how [his] functional incapacity renders [him] unable to perform [his] usual work." Santiago, 944 F.2d at 5.

After reviewing the record and questioning plaintiff and the vocational expert, the ALJ concluded that plaintiff retained the functional capacity to alternate between sitting and standing, and to perform work that required light amounts of exertion. (Tr. 47-52). Plaintiff admitted that he can perform a variety of daily tasks including cooking, food shopping, house cleaning, exercising, lawn mowing, and snow-blowing, and travel to a gym for exercise. (Id.). The record also contains medical evidence to support the ALJ's determination that plaintiff was not disabled. See, e.g., Tr. 62-70 (Disability determination made by Dr. Muro Proctor, dated January 6, 1994, concluding that plaintiff is capable of light work); Tr. 75 (Dr. A.C. Campbell's affirmation of Dr. Proctor's opinion.). Plaintiff, on the other

21

hand, presented only his chiropractor's opinion that he is permanently disabled. (Tr. 63-70, 75, 104-114, 139-140).[10]

In the end, it is clear that the ALJ adequately developed the record and, to the extent that plaintiff has identified evidentiary gaps, they are not material.

Next, plaintiff argues that the ALJ did not thoroughly question the vocational expert. Plaintiff's Memorandum at 15. The record demonstrates that the ALJ properly qualified the vocational expert and established a foundation for his testimony. (See Tr. 52, 144-149). The record also shows that the ALJ properly questioned the vocational expert, posing a hypothetical that incorporated plaintiff's impairments, limitations, and relevant past work activities. (Tr. 53-56). The ALJ also afforded plaintiff the opportunity to question the vocational expert and supplement the hypothetical. (Tr. 56). In light of

---

[10] Chiropractors are not considered an acceptable source of medical evidence regarding the claimant's impairment. 20 C.F.R. 404.1513 (a). Accordingly, the ALJ is entitled to give their opinions regarding the nature and scope of the plaintiff's impairment less weight. Diaz v. Secretary of Health & Human Servs., 59 F.3d 307, 314 (2d Cir. 1995); Cronkhite v. Secretary of Health & Human Servs., 935 F.2d 133, 134 (8th Cir. 1991). See also 20 C.F.R. § 404.1513 (e).

this, the court concludes that the vocational expert's testimony was properly received and developed.

Plaintiff also contends that the ALJ failed to obtain records from November 1993 through November 1994 from Mark Stagnone, plaintiff's chiropractor. He claims that the ALJ's failure to obtain those records resulted in an evidentiary gap that undermined his credibility and prejudiced his claim. Plaintiff's Memorandum at 16-17.

It is unclear if plaintiff claims that chiropractor Stagnone's records constitute "new" evidence of plaintiff's impairment which would, if properly submitted, constitute grounds for remand. See Evangelista, 826 F.2d at 139. However, to be considered as new evidence, it must be material (i.e., not merely cumulative) and good cause must be shown as to why the evidence was not incorporated in a prior proceeding. (Id.). Here, plaintiff has not crossed that threshold. Mark Stagnone's latest report contains no new information regarding plaintiff's impairments or restrictions. See Plaintiff's Memorandum, Attachment F; see also Tr. 62-69, 75, 81-86, 101-114. Moreover,

23

at the hearing, the ALJ specifically asked plaintiff if he wished to supplement the record with additional materials:

> ALJ: I'm going to take just a moment to go over the documents that we have set aside in the record and you've had a chance to look these documents over before the hearing today. These are important papers that have been assembled. Many of these documents you will have your own copies of. We had marked all of these documents as Exhibits 1 through 22. Any my first question to you this morning is <u>do you have any other medical records or any other statements with you this morning that I don't have that you would like to introduce</u>?
>
> CLMT: No.

Tr. 34-35 (emphasis added). In light of that exchange, plaintiff can hardly complain that the ALJ failed to identify (and remedy) the alleged evidentiary gap.

Finally, plaintiff's claim for Social Security benefits was not prejudiced by the failure to acquire those records; even if the ALJ had considered Stagnone's most recent report, it would not been entitled to controlling weight. 20 C.F.R. § 404.1513 (e) (3); <u>Diaz v. Shalala</u>, 59 F.3d 307, 313, n.5 (2d Cir. 1995). Plaintiff has not explained how that factor might have altered the ALJ's determination, or how he was prejudiced by its absence.

24

Despite plaintiff's claims to the contrary, it is clear that the ALJ properly gathered and considered the necessary documentary evidence upon which to base his conclusion that Mr. Mandziej was not disabled within the meaning of the Act. Ultimately, the ALJ need not make out a pro se claimant's case. See Holland, 764 F.2d at 1563. Here, even taking into consideration the fact that plaintiff elected to proceed pro se, the ALJ adequately raised, explored, and considered the relevant evidence concerning plaintiff's claim for Social Security benefits.

> It is not enough to say that had [the ALJ] seen more information his decision would have been different. It is probable that in all pro se cases additional material could have been generated by counsel. But where the evidence before the ALJ is sufficient to lead to a determination, it is not a due process violation that his investigation failed to produce the additional information.

Id.; See also, Evangelista, 826 F.2d at 142; Edwards, 937 F.2d at 585-86; Born v. Secretary of Health & Human Servs., 923 F.2d 1168, 1172 (6th Cir. 1990); Wingert, 894 F.2d at 298. Accordingly, the court holds there are no prejudicial gaps in the evidence that would constitute grounds for reversal or remand of the ALJ's decision.

C.  **Prior Work**

Next, plaintiff contends that the ALJ neglected to question him regarding the physical and mental requirements of his past relevant work experience as automobile service advisor. Plaintiff's Memorandum at 17.  Because the ALJ failed to do this, plaintiff says the record does not contain specific findings of fact to support a determination that plaintiff was capable of returning to work as an automobile service advisor.  Plaintiff's Memorandum at 17-18.

This argument is similar to the one previously considered and, for the reasons stated above, it too must fail.  The record contains substantial evidence to support the conclusion that plaintiff is ineligible for Social Security benefits.  Plaintiff simply did not discharge his initial burden in step four of the five-step sequential analysis.  See Santiago, 944 F.2d at 5.

The record before the ALJ contained information regarding the specific physical and mental requirements of plaintiff's past relevant work experience.  In fact, plaintiff himself provided a detailed description of the job requirements of an automobile service advisor.  (Tr. 85-86).  In short, the ALJ sufficiently developed the record regarding the specific physical and mental

26

requirements of plaintiff's past relevant work. Plaintiff's claims to the contrary are unavailing.

### D. Regimen Of Treatment

Finally, plaintiff argues that the ALJ failed to properly consider his regimen of treatment. Plaintiff's Memorandum at 18. The ALJ noted that plaintiff exercised at a health club four times per week, swam, performed leg exercises, and used traction equipment. (Tr. 19). Plaintiff claims that rather than considering his treatment regimen as evidence of his disability, the ALJ improperly considered it as evidence which: (1) demonstrated plaintiff's physical abilities actually exceeded the limitations plaintiff claimed; and (2) undermined plaintiff's credibility, particularly with regard to his subjective complaints of constant and debilitating pain. Plaintiff's Memorandum at 18-19.

Regimen of treatment is but one factor to assist the ALJ in his determination of the claimant's credibility. See 20 C.F.R. §404.1529 (c)(3)(i), (v), (vi); see, e.g., Harrell v. Harris, 610 F.2d 355, 359 (5th Cir. 1980); Epps v. Harris, 624 F.2d 1267, 1273 (5th Cir. 1980). The record reveals that the ALJ considered

27

plaintiff's regimen of treatment as well as other evidence of impairment. (See Tr. 19, 49, 50, 51). The evidence plainly supports the ALJ's conclusion that plaintiff's physical exercise program, at a minimum, suggests that he is able to engage in light exertional work. While other courts have utilized regimen of treatment as substantial evidence of impairment when the regimen hindered the claimant's working ability, see, Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984), plaintiff does not claim that his treatment regimen required so much time that it would have interfered with his ability to work. Accordingly, his argument must fail.

Ultimately, in reaching his conclusion that plaintiff was not disabled, the ALJ appears to have relied heavily upon the lack of any medical certification that plaintiff was actually disabled (in fact, the medical opinions suggested that plaintiff was not disabled) and his belief that plaintiff's subjective complaints of constant and debilitating pain were not entirely credible. Of course, the ALJ is required to consider the subjective complaints of pain by a claimant who presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." 42 U.S.C. §

28

423(d)(5)(A); <u>Avery v. Secretary of Health and Human Servs.</u>, 797 F.2d 19, 21 (1st Cir. 1986); 20 C.F.R. § 404.1529. And, "complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." <u>Dupuis v. Secretary of Health and Human Servs.</u>, 869 F.2d 622, 623 (1st Cir. 1989). The ALJ is not, however, "required to take the claimant's assertions of pain at face value." <u>Bianchi v. Secretary of Health and Human Servs.</u>, 764 F.2d 44, 45 (1st Cir. 1985) (quoting <u>Burgos Lopez v. Secretary of Health and Human Servs.</u>, 747 F.2d 37, 40 (1st Cir. 1984)).

When a claimant complains that pain or other subjective symptoms are a significant factor limiting his or her ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must consider additional evidence, such as the claimant's prior work record; daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other symptoms, past or present; any measures used, past or present, to

29

relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 416.929(c)(3); Avery, 797 F.2d at 23.

Here, the ALJ considered such evidence and made specific findings in support of his conclusion that plaintiff's "testimony was not credible." (Tr. 18) For example, the ALJ properly considered plaintiff's ability to perform household chores, his ability to exercise and swim three or four times each week, his lack of reliance upon prescription pain medications, his lack of any need for regular medical attention, his lack of any cognitive deficits (which one might expect to see in an individual suffering from the pain claimant describes), and plaintiff's conduct at the hearing itself. (Tr. 18-19).

The court cannot find that the ALJ's interpretation of plaintiff's subjective complaints of pain was unsupported by the record. It was.

IV. **CONCLUSION**

For the reasons stated above, the court holds that the ALJ properly developed the record and considered all the relevant

30

evidence in making his determination. His conclusion that plaintiff is not disabled within the meaning of the Act and, therefore, not entitled to receive Social Security benefits, is supported by substantial medical evidence. Accordingly, plaintiff's motion to reverse the decision of the Secretary (document no. 7) is denied. Defendant's motion to affirm the decision of the Commissioner (document no. 9) is granted.

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

September 24, 1996

cc: Raymond J. Kelly, Esq.
    David L. Broderick, Esq.

31