UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kara Lea Maynard

        v.                              Civil No. 17-cv-087-PB
                                        Opinion No. 2018 DNH 030
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

**MEMORANDUM AND ORDER**

        Pursuant to 42 U.S.C. § 405(g), Kara Maynard moves to

reverse the decision of the Acting Commissioner of the Social

Security Administration ("SSA") to deny her application for

disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. § 423.  The Acting Commissioner, in turn,

moves for an order affirming her decision.  For the reasons that

follow, this matter is remanded to the Acting Commissioner for

further proceedings consistent with this Memorandum and Order.


**I. Standard of Review**

        The applicable standard of review in this case provides, in

pertinent part:

        The [district] court shall have power to enter, upon
        the pleadings and transcript of the record, a judgment
        affirming, modifying, or reversing the decision of the
        Commissioner of Social Security, with or without
        remanding the cause for a rehearing.  The findings of
        the Commissioner of Social Security as to any fact, if
        supported by substantial evidence, shall be conclusive
        . . .

42 U.S.C. § 405(g).  Nevertheless, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).  As for the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917–18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  However, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)

2

(citations omitted).  The court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

## II.  Background

Maynard was born in 1979.  She last worked in April of 2006 in customer service.  In March 2010, she applied for disability insurance benefits ("DIB"), and she identified the following medical conditions as limiting her ability to work: chronic dorsalgia;[1] congenital scoliosis;[2] recurrent migraines, including hemiplegic;[3] muscular spasms; hypothyroidism; myofascial

---

[1] Dorsalgia is "pain in the back."  Dorland's Illustrated Medical Dictionary 563 (32nd ed. 2012).

[2] Scoliosis is "[a]bnormal lateral and rotational curvature of the vertebral column."  Stedman's Medical Dictionary 1734 (28th ed. 2006).

[3] Hemiplegic migraines are "a form associated with transient hemiplegia."  Stedman's, supra note 2, at 1212.  Hemiplegia is "[p]aralysis of one side of the body."  Id. at 866.

etiology;[4] and extensive, incurable back pain and debilitating migraines.  Doc. 12 at 1.  While Maynard initially claimed to have become disabled on April 1, 2006, she has since amended her alleged onset date to November 1, 2008.  Id. at 1, 17.

The SSA initially denied Maynard's claim, but she appealed the denial, and after a hearing before Administrative Law Judge ("ALJ") Edward Hoban, Maynard received a fully favorable decision on her claim in December 2011.  Id. at 1.  The SSA Appeals Council vacated ALJ Hoban's decision, and remanded with instructions to refer Maynard for a consultative examination ("CE").[5]  Id. at 2.  The SSA, in turn, sent Maynard to Dr. William Windler, who performed a CE in December 2012.  Id. at 12; Administrative Transcript ("Tr.") 674.  In his report on the examination he administered, Dr. Windler documented Maynard's complaints of whole-body pain, numbness, and tingling; migraine headaches; light sensitivity; and depression.  Tr. 674-675.  He also reported findings of diffuse tenderness: (1) over the

---

[4] Myofascial means "[o]f or relating to the fascia surrounding and separating muscle tissue."  Stedman's, supra note 2, at 1272.  Fascia is "[a] sheet of fibrous tissue that envelops the body beneath the skin; it also encloses muscles and groups of muscles and separates their several layers or groups."  Id. at 700.

[5] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request . . ."  20 C.F.R. § 404.1519.

musculature of Maynard's neck; (2) over her abdomen; (3) throughout her upper extremities; (4) over the paraspinous muscles throughout her thoracolumbar spine; and (5) throughout her lower extremities.[6]  Tr. 676.  Dr. Windler concluded his report:  "She has diffuse aches and pains and tender points in all four quadrants consistent with a fibromyalgia."  Tr. 676.  In a separate document, i.e., a Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Windler gave his opinions on Maynard's residual functional capacity ("RFC").[7]  Tr. 679-684.

The record also includes a June 2013 letter addressed "To whom it may concern," from Maynard's treating physician, Concetta Oteri, D.O.  Tr. 794.  Maynard first saw Dr. Oteri in September of 2008, complaining of cerumen impaction.[8]  Tr. 403.  In January of 2009, Maynard presented to Dr. Oteri "with symptoms that she had for quite a long time several years," including headaches with migraines, numbness, back pain, significant fatigue and poor

---

[6] More specifically, Dr. Windler found "some tenderness over the greater trochanteric regions bilaterally" and "slight tenderness with patellar manipulation."  Tr. 676.

[7] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

[8] Cerumen is "[t]he soft, brownish yellow, waxy secretion (a modified sebum) of the ceruminous glands of the external auditory canal."  Stedman's, supra note 2, at 351.

5

sleep quality.  Tr. 401.  Dr. Oteri gave assessments of fatigue, paresthesia,[9] and back pain.  Tr. 401.  In addition, after noting that Maynard had never had a "significant workup" regarding fibromyalgia, Dr. Oteri ordered a battery of diagnostic tests. Tr. 401.

In her June 2013 letter, Dr. Oteri listed a diagnosis of fibromyalgia.  Tr. 794.  In support of that diagnosis, and several others, Dr. Oteri reported the following symptoms:

> stroke-like migraine episodes, cognitive and memory impairment, hypersensitivity to hot and cold as well as climatic change, muscle fatigability, swollen and tender lymph nodes, movement disorder, chronic musculoskeletal pain, chronic fatigue, sleep disturbance, persistent muscle tenderness, irritable bowels including diarrhea and constipation, non-cardiac chest pain, sporadic throat soreness, recurring bursitis, balance and coordination problems, recurring migraines, clinical depression, neurological problems, anxiety and poor concentration.

Tr. 794.  Dr. Oteri continued:

> The diagnosis of Fibromyalgia is based on the following clinical findings: We did screening laboratory tests to exclude other medical conditions such as rheumatoid arthritis, myositis, hypothyroidism, multiple sclerosis, and lupus.  Also, The American College of Rheumatology ["ACR"] (Wolfe, et al. Arthritis & Rheumatism 33:160, 1990) has established general classification guidelines for Fibromyalgia.  These guidelines require that widespread aching be present for at least 3 months and a minimum of 11 out of 18 tender points be met and the patient meets both of these criteria including at least 16 of the 18 tender

---

[9] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems." Stedman's, supra note 2, at 1425.

6

points on each examination. Tr. 795. Furthermore, Dr. Oteri noted that "[a]ntidepressant medications are the most frequently used and best studied drugs for the treatment of ME/CFS and Fibromyalgia,"[10] and then then went on to describe a largely unsuccessful course of antidepressant medications she had prescribed for Maynard. Tr. 795. Dr. Oteri's contemporaneous treatment notes from 2013, in turn, fully document her statements that beginning in 2009, she gave Maynard prescriptions for Cymbalta,[11] Amitriptyline,[12] and Celexa.[13] Tr. 795. Dr. Oteri concluded her letter with an opinion on Maynard's ability to work. Tr. 797-798.

In June 2013, Maynard received a second hearing before a

---

[10] ME/CFS stands for myalgic encephalomyelitis/chronic fatigue syndrome. Encephalomyelitis is an "[i]nflammation of the brain and spinal cord." Stedman's, supra note 2, at 635. Myalgia is "[m]uscular pain." Id. at 1265.

[11] Cymbalta is a "trademark for a preparation of duloxetine hydrochloride." Dorland's, supra note 1, at 457. Duloxetine hydrochloride is "a serotonin-norepinephrine reuptake inhibitor, used for the treatment of major depressive disorder." Id. at 572.

[12] Amitriptyline hydrochloride is "[a] chemical compound of the tricyclic antidepressant class that can be used to treat some sleep disorders and neurogenic pain syndromes." Stedman's, supra note 2, at 63.

[13] Celexa is a "trademark for a preparation of citalopram hydrobromide." Dorland's, supra note 1, at 312. Citalopram hydrobromide is "a selective serotonin reuptake inhibitor . . . used as an antidepressant." Id. at 366.

different ALJ, Thomas Merrill.  Doc. 12 at 2.  A month later, he denied Maynard's claim.  In his decision, the ALJ determined that Maynard had the severe impairments of migraines and chronic low back pain.  Tr. 13.  He also noted that Maynard had alleged limitations due to fibromyalgia.  While he did not determine that her fibromyalgia was a severe impairment, he did consider the effects of fibromyalgia when determining Maynard's RFC.  Tr. 13.  With regard to the medical opinion evidence, the ALJ gave: (1) significant weight to the opinion of Dr. Arthur Brovender, an orthopedic surgeon, who examined some of Maynard's medical records and testified, by telephone, at her 2013 hearing; (2) significant weight to the opinion of Dr. Hugh Fairley, a state-agency consultant who examined some of Maynard's medical records and prepared an assessment of her physical RFC in August of 2010;[14] (3) limited weight to opinions rendered by Dr. Oteri in 2010 and 2013; and (4) limited weight to the opinions rendered by Dr. William Windler after his 2012 CE.  Tr. 17-18.

Maynard appealed.  In an order dated October 7, 2015, Judge McCafferty reversed the ALJ's decision on grounds that he had improperly weighed the expert-opinion evidence.  See Maynard v. Colvin, 2015 DNH 192, at *12.  Judge McCafferty also noted, and

---

[14] As it happens, in his favorable decision from 2011, ALJ Hoban had discounted Dr. Fairley's opinion.  See Maynard v. Colvin, 2015 DNH 192, at *3.

the Acting Commissioner conceded, that when evaluating Maynard's claim, "the ALJ did not apply the relevant SSA guidelines for evaluating DIB claims based upon fibromyalgia." Id. at 12. Judge McCafferty went on to say that "[o]n remand, the ALJ should apply Social Security Ruling ['SSR'] 12-2p, 'Evaluation of Fibromyalgia,' when considering Maynard's claim." Id. After Judge McCafferty issued her order, the SSA Appeals Council issued an order "remand[ing] [Maynard's] case to an [ALJ] for further proceedings consistent with the order of the court." Tr. 907.

On remand, Maynard obtained and submitted three more opinions from Dr. Oteri. Tr. 838. Each opinion was dated June 1, 2016, and each was submitted on a form that was captioned "Physical Medical Source Statement," and that had a hand-written notation above the caption. One notation said: "Please fill out as of Nov. 1, 2008." Tr. 1168. Another notation said: "Please fill out as of Nov. 1, 2008 to current." Tr. 1178. And the third notation said: "Please fill out as of current." Tr. 1173. At Maynard's June 2016 hearing (her second before ALJ Merrill and her third overall), a vocational expert testified that a person with the limitations described in Dr. Oteri's retrospective Medical Source Statement would be unable to meet the demands of any job. Tr. 855-856.

After Maynard's hearing, the ALJ issued a decision in which he evaluated all the opinions he had considered in his 2013

9

decision, and gave them essentially the same weight he had given them in 2013.[15]  In addition, the he gave "little weight" to each of the three new opinions from Dr. Oteri that Maynard submitted in anticipation of her 2016 hearing.  Tr. 822.

With respect to fibromyalgia, the ALJ found "that the evidence does not support a finding [that] fibromyalgia meets the criteria to be considered as a medically determinable impairment."  Tr. 815.  He then gave the following assessment of Maynard's RFC:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she has the ability to stand and walk for two hours each and sit for six hours in an eight hour workday, with unlimited use of hands or feet to operate controls and to push/pull.  She is unable to crawl or climb ladders, ropes and scaffolds, and she is able to occasionally balance, stoop, kneel, crouch, and climb ramps and stairs.  She must avoid unprotected heights.

Tr. 817.  On the basis of the foregoing RFC, the ALJ determined, just as he had in his previous decision, that Maynard was capable of performing her past relevant work as a customer service representative.  Tr. 825.

## III.  Discussion

---

[15] While this is probably a distinction without a difference, the ALJ gave "significant" weight to the opinions of Dr. Brovender and Dr. Fairley in 2013, but gave "substantial" weight to those opinions in 2016.  See Tr. 17, 823, 824.

10

## A.    The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(E).  The only question in this case is whether the ALJ correctly determined that Maynard "was not under a disability, as defined in the Social Security Act, at any time from April 1, 2006, the alleged onset date, through December 31, 2010, the date last insured," Tr. 825.[16]

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step process.  See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

---

[16] Earlier in his decision, the ALJ stated that "[b]efore the current hearing in this matter, the claimant amended her alleged onset date [from April 1, 2006] to November 1, 2008," so it is not clear why he used the 2006 date in his conclusion.  Tr. 808.

11

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920, which outlines the five-step process for Supplemental Security Income, which is the same as the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is disabled. See Bowen v. Yuckert, 482 U.S. 137, 146 (1987). She must do so by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)). Finally,

> [i]n assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant's] subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6 (1st Cir. 1982)).

**B. Maynard's Claims**

Maynard claims that the ALJ erred by: (1) determining that her fibromyalgia was not a medically determinable impairment ("MDI"); (2) improperly weighing the expert-opinion evidence; and (3) improperly weighing the "other source" evidence. Maynard's first claim is persuasive and dispositive.

1. Fibromyalgia as an MDI

In her order remanding Maynard's case to the SSA, Judge

12

McCafferty directed the ALJ to apply SSR 12-2p when considering Maynard's claim. Maynard v. Colvin, 2015 DNH 192, at *12. The ALJ did so, and determined that Maynard's purported fibromyalgia ("FM") was not an MDI. Tr. 811-813.

According to the applicable regulations, an MDI "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521. For that reason, an MDI "must be established by objective medical evidence from an acceptable medical source." Id. When the potential MDI at issue is fibromyalgia, "[a] licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence." SSR 12-2p, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012). SSR 12-2p goes on to explain that the SSA "will find that a person has an MDI of FM if the physician diagnosed FM and provides the evidence [the SSA] describe[s] in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." Id.

Section II.A. of SSR 12-2p is based upon "[t]he 1990 ACR [American College of Rheumatology] Criteria for the Classification of Fibromyalgia," and provides that FM may be an MDI if a claimant: (1) has "[a] history of widespread pain . . .

13

that has persisted (or that persisted) for at least 3 months"[17]; (2) has "[a]t least 11 [of 18] positive tender points on physical examination"[18]; and (3) produces "[e]vidence that other disorders that could cause the symptoms or signs were excluded." SSR 12-2p, 2012 WL 3104869, at *2-*3.

Section II.B. is based upon "[t]he 2010 ACR Preliminary Diagnostic Criteria," and provides that that FM may be an MDI if a claimant: (1) has "[a] history of widespread pain"; (2) has "[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome"[19]; and

---

[17] Widespread pain is "pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)." SSR 12-2p, 2012 WL 3104869, at *2.

[18] "The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist." SSR 12-2p, 2012 WL 3104869, at *3.

[19] The applicable signs "include muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms." SSR 12-2p, 2012 WL 3104869, *3 at n.9. The applicable co-occurring conditions

14

(3) produces "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."  SSR 12-2p, 2012 WL 3104869, at *3.

The ALJ in this case determined that Maynard's fibromyalgia was not an MDI.  It is not unusual for courts to affirm such determinations.  For example, in Tozier v. Berryhill, the magistrate judge recommended affirming the ALJ's determination that FM was not an MDI where: (1) the ALJ found that "the record [did] not confirm that [the claimant had] the requisite number and location of tender trigger point findings and there [was] no evidence that medical doctors [had] excluded other impairments as required in [SSR] 12-2p,"; and (2) two doctors who reviewed the claimant's medical records found "that there was no examination confirming fibromyalgia by the requisite criteria."  No. 1:16-cv-540-NT, 2017 WL 3331776, at *3-*4 (D. Me. Aug. 4, 2017) (quoting the record), adopted by No. 1:16-cv-540-NT, 2017 WL 4015652 (D. Me. Sept. 11, 2017).  In Sinclair v. Berryhill, Judge Young affirmed the ALJ's determination that FM was not an MDI where the claimant did not produce evidence that: (1) any acceptable medical source had found the requisite number of tender points;

---

include "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome."  Id. *3 at n.10.

(2) she had manifested the requisite number of FM signs, symptoms, or co-occurring conditions; or (3) any acceptable medical source had excluded other disorders that could have caused her signs or symptoms.  See 266 F. Supp. 3d 545, 553-554 (D. Mass. 2017).

This case is distinguishable from both Tozier and Sinclair. Unlike the record in Tozier, the record in this case includes confirmation of the requisite number and location of trigger point findings (in Dr. Oteri's May 2013 letter) and evidence that a doctor excluded other impairments (also in Dr. Oteri's May 2013 letter).  And while the record in Tozier included statements by two doctors to the effect that the claimant's medical records documented no examination confirming fibromyalgia by the relevant criteria, Judge McCafferty has already noted that Dr. Brovender's characterization of Dr. Windler's examination report as failing to discuss tender points was incorrect, see Maynard, 2015 WL 5838319, at *11, so this case lacks an analogue to the two doctors' statements in Tozier.  And, in contrast with the record in Sinclair, the record in this case includes evidence that: (1) an acceptable medical source (Dr. Oteri) found the requisite number of tender points; (2) Maynard had manifested the requisite number of FM signs, symptoms, or co-occurring conditions

16

(reported in both Dr. Windler's report[20] and Dr. Oteri's May 2013 letter[21]); and (3) an acceptable medical source (Dr. Oteri) had excluded other disorders that could have caused Maynard's signs or symptoms.

For his part, in support of his determination that Maynard's purported FM was not an MDI, the ALJ focused on: (1) Maynard's failure to claim that she was disabled as a result of FM in any of her application materials; (2) Dr. Fairley's observation that Maynard did not claim to be disabled due to FM; (3) the lack of a diagnosis of FM in any medical record generated prior to Maynard's date last insured, i.e., December 31, 2010; and (4) his determination that Maynard's medical records, prior to her date last insured, did not document the criteria necessary to establish FM, under the standard set out in SSR 12-2p. Tr. 813-814. Then, in the section of his decision devoted to opinion evidence, the ALJ discussed Dr. Oteri's May 2013 letter, and assigned it little weight because: (1) the letter was inconsistent with Dr. Oteri's examination records during the time prior to Maynard's date last insured because those records do not

---

[20] Dr. Windler reported manifestations of whole-body pain, numbness, tingling, depression, light sensitivity, and migraine. See Tr. 674-75.

[21] Dr. Oteri reported manifestations of irritable bowel syndrome, thinking or remembering problems, muscle weakness, insomnia, depression, constipation, chest pain, diarrhea, anxiety disorder, chronic fatigue syndrome, and migraine. See Tr. 794.

17

include a diagnosis of fibromyalgia, a tender-point evaluation, or a four quadrant evaluation; (2) Dr. Oteri is "an osteopathy [sic] and the record includes no evaluation by a rheumatologist," Tr. 822; (3) the letter falsely represents that Maynard was diagnosed with fibromyalgia in 2009; (4) the letter represents that Maynard "enrolled" as Dr. Oteri's patient in 2009 when, in fact, she had been a patient in Dr. Oteri's practice since at least 2007; (5) the letter reports diagnoses that do not appear in Dr. Oteri's treatment notes; and (6) while the letter indicates that Maynard experienced widespread aching for at least three months and had at least 11 positive tender points on each examination, Dr. Oteri's examination notes do not document either condition. Tr. 822.

The question before the court is whether the ALJ's determination that Maynard's fibromyalgia was not an MDI is supported by substantial evidence. It is not. In the remainder of this section, the court begins by discussing the four reasons the ALJ gave for determining that Maynard's FM was not an MDI, and then turns to the six reasons he gave for assigning limited weight to Dr. Oteri's opinions, including her appraisal of Maynard's FM.

**a. ALJ's reasons for determining that Maynard's fibromyalgia was not a medically determinable impairment**

**i. Maynard's failure to claim that she**

18

> was disabled as a result of fibromyalgia in any
> of her application materials

The ALJ does not explain how Maynard's failure to identify FM as a disabling impairment in her application materials has any bearing on the analysis mandated by SSR 12-2p, and the court can discern no way in which this fact would support a determination that Maynard's FM was not an MDI.

> ii.  Dr. Fairley's observation that
> Maynard did not claim to be disabled due to
> fibromyalgia

The ALJ does not explain how Dr. Fairley's observation that Maynard did not identify FM as a disabling impairment in her application materials has any bearing on the analysis mandated by SSR 12-2p, and the court can discern no way in which this fact would support a determination that Maynard's FM was not an MDI.

> iii. The lack of a diagnosis of
> fibromyalgia in any medical record generated
> prior to Maynard's date last insured, i.e.,
> December 31, 2010

The ALJ is correct in noting that no treating physician ever formally diagnosed Maynard with FM before December 31, 2010.  But the persuasive value of that fact is diminished to the point of insubstantiality by two facts the ALJ does not mention: (1) in 2009, Dr. Oteri ordered diagnostic testing to exclude disorders other than FM that could have caused Maynard's signs and

19

symptoms;[22] and (2) starting in 2009, Dr. Oteri prescribed a course of treatment, i.e., antidepressant medication, that is indicated for FM.

      iv.  The ALJ's determination that Maynard's medical records, prior to her date last insured, did not document the criteria necessary to establish FM, under the standard set out in SSR 12-2p

As the court has already noted, before Maynard's date last insured, Dr. Oteri had excluded other conditions that could have caused Maynard's signs and symptoms and had initiated a course of treatment that is indicated for FM. Thus, the lack of documentation in Maynard's medical records that fully supports an SSR 12-2p analysis is not substantial evidence that Maynard's FM was not an MDI.

    **b.  ALJ's reasons for giving limited weight to Dr. Oteri's opinions**

      i.  The purported inconsistency between Dr. Oteri's May 2013 letter and her examination records during the time prior to Maynard's date last insured (which do not include a diagnosis

_____

[22] In her May 2013 letter, Dr. Oteri explained: "We did screening laboratory tests to exclude other medical conditions such as rheumatoid arthritis, myositis, hypothyroidism, multiple sclerosis, and lupus." Tr. 795.

> of fibromyalgia, a tender-point evaluation,
> or a four-quadrant evaluation)

Again, Dr. Oteri's treatment records indicate that before Maynard's date last insured, Dr. Oteri had excluded other conditions that could have caused Maynard's signs and symptoms and had initiated a course of treatment that is indicated for FM. Those aspects of Dr. Oteri's treatment records are entirely consistent with her May 2013 letter. Moreover, while Dr. Oteri's treatment records do not include an express diagnosis of fibromyalgia, a tender-point evaluation, or a four-quadrant evaluation, those omissions only establish that Dr. Oteri's treatment records do not support the statements in her May 2013 letter, not that they are inconsistent with it. Those records would be inconsistent if, for example, they had documented a tender-point evaluation that revealed 8 of 16 tender points rather than the 16 of 18 that Dr. Oteri mentioned in her letter. But, that is not the case here; the records are simply silent.

### ii.  Dr. Oteri's status as an osteopath and the lack of any evaluation by rheumatologist

SSR 12-2p does not say that evidence on fibromyalgia must come from a rheumatologist; it provides that "a medical or osteopathic doctor is the only acceptable medical source who can provide such evidence." SSR 12-2p, 2012 WL 3104869, at *2. Dr. Oteri is an osteopathic doctor. Thus, she is an acceptable medical source, for the purposes of SSR 12-2p.

### iii. The May 2013 letter's representation that Dr. Oteri diagnosed Maynard with fibromyalgia in 2009

Given the court's determination that the lack of an express diagnosis of FM prior to Maynard's date last insured is not substantial evidence to support a determination that Maynard's FM was not an MDI, the court can discern no way in which the inaccuracy of the statement in Dr. Oteri's May 2013 letter about a 2009 diagnosis would support a determination that Maynard's FM was not an MDI.

### iv. The May 2013 letter's representation that Maynard "enrolled" as Dr. Oteri's patient in 2009 when, in fact, she had been a patient in Dr. Oteri's practice since at least 2007

The court can discern no way in which the purported inaccuracy of the statement in Dr. Oteri's May 2013 letter about when Maynard became her patient would support a determination that Maynard's FM was not an MDI.

### v. The May 2013 letter's references to diagnoses that do not appear in Dr. Oteri's treatment notes

The only diagnosis that matters is fibromyalgia, and the court has already explained why the lack of an express diagnosis of FM in Dr. Oteri's treatment notes does not support a determination that Maynard's FM was not an MDI.

### vi. The lack of substantiation in Dr. Oteri's examination notes for her statements, in the 2013 letter, that Maynard experienced widespread aching for at least three months and

22

<u>had 16 positive tender points on each examination</u>

SSR 12-2p provides that a determination that fibromyalgia is an MDI must come from an acceptable medical source. Dr. Oteri is an acceptable medical source who provided evidence that prior to Maynard's date last insured, she experienced widespread aching for at least three months and had 16 FM tender points. SSR 12-2p requires evidence from an acceptable medical source, but there is nothing in SSR-2p to suggest that Dr. Oteri's retrospective evidence is somehow invalid because the findings she reported were not documented in her examination notes. To be sure, SSR 12-2p provides that the SSA "will review the physician's treatment notes to see if they are consistent with the diagnosis of FM," 2012 WL 3104869, at *2, but it is difficult to see how treatment for fibromyalgia in the form of antidepressant medication, prescribed after diagnostic testing to exclude other impairments, is inconsistent with a diagnosis of FM. Accordingly, the lack of substantiation in Dr. Oteri's examination notes for her subsequent findings concerning widespread aching and tender points does not support a determination that Maynard's FM was not an MDI.

In sum, the ALJ's determination that Maynard's fibromyalgia does not qualify as an MDI is not supported by substantial evidence. Given the degree to which the decision as to whether or not FM is an MDI reverberates through the sequential

23

evaluation process, see SSR 12-2p, 2012 WL 3104869, at *5-6, the ALJ's failure to make a determination that is supported by substantial evidence merits a remand.

2. Evaluation of Medical Expert Opinions

Because this case is being remanded for the reasons given above, the court need not dwell on the manner in which the ALJ evaluated the expert medical opinions, but because that issue was the basis for Judge McCafferty's remand, the court will deal with it briefly.

**a. Dr. Windler's Opinion**

In December 2012, in conjunction with his consultative examination, Dr. Windler completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). Tr. 679-684. Judge McCafferty described the opinions in Dr. Windler's Medical Source Statement:

> [H]e opined that Maynard could sit for about 30 minutes at a time and stand or walk for about 15 minutes at a time. He also opined that she could sit, stand, and walk for a total of one hour each during the course of an eight-hour workday, and indicated that she would need to spend the remainder of an eight-hour work day reclining, lying down, or soaking in a warm tub.

Maynard, 2015 DNH 192, at *3. In his 2013 decision,

> [t]he ALJ gave "limited weight to the opinion of the consultative examiner, Dr. William Windler, M.D. . . . . because it [was] mostly conclusory, with little evidence cited to support his opinion of disability," because "[t]he functional limitations appear to be based solely on the claimant's self-reported limits,"

24

and because the "opinion . . . is inconsistent with [Dr. Windler's] own exam."

Id. at *10 (citation to the record omitted). Judge McCafferty determined that "[t]he ALJ's appraisal of Dr. Windler's opinion [was] not well supported." Id.

In his 2016 decision, the ALJ presents the very same analysis of Dr. Windler's opinion that Judge McCafferty rejected, with the following addition:

> [Dr. Windler] noted that [Maynard] did not bring a photo ID to the exam, and he did not state whether he reviewed the longitudinal medical records as required under SSR 12-2p, although he did mention some findings that he said were in her "chart."

Tr. 824.[23] If Dr. Windler mentioned findings in Maynard's chart, he necessarily reviewed her longitudinal medical records, and his Medical Source Statement includes six references to Maynard's medical history. See Maynard, 2015 DNH 192, at *4. Accordingly, the lack of a sentence specifically stating that Dr. Windler

---

[23] As an ancillary matter, it is not clear how the provisions of SSR 12-2p apply to the question of whether the ALJ evaluated Dr. Windler's opinion on Maynard's RFC in accordance with 20 C.F.R. § 404.1527. The "requirement" to which the ALJ refers appears to be directed to the evidence necessary to support a determination that fibromyalgia is an MDI. See SSR 12-2p, 2012 WL 3104869, at *1. Moreover, while SSR 12-2p states that "it is important that the medical source who conducts the [consultative examination] has access to longitudinal information about the [claimant]," it goes on to provide that the SSA "may rely on the CE report even if the person who conducts the CE did not have access to longitudinal evidence if [the SSA] determine[s] that the CE is the most probative evidence in the case record." Id. at *5. This suggests that access to longitudinal information is preferable, but not a "requirement."

25

reviewed Maynard's longitudinal medical records is not a good reason for discrediting his opinion on Maynard's RFC.  As for Maynard's failure to bring a photo ID to the CE, the court is a loss to see how that fact has any bearing on any relevant issue. In sum, the ALJ's 2016 evaluation of Dr. Windler's opinion does not appear to be any better supported than the evaluation that Judge McCafferty rejected in her order on the ALJ's 2013 decision.

### b.  Dr. Oteri's 2013 Opinion

In her May 2013 letter, Dr. Oteri described the symptoms and clinical findings supporting her diagnosis of fibromyalgia and then went on to state that "[o]ral antidepressant medication therapy [was] not effective for [Maynard] and so we are using narcotic pain medication to control as much of the pain for [Maynard] as possible."  Tr. 797.  Dr. Oteri then opined that

> Maynard was completely and permanently disabled prior to [Dr. Oteri's] enrolling her as a patient in 2009, became unable to work due to her medical issues prior to [Dr. Oteri's] enrolling her as a patient in 2009, is unable to work in any capacity and . . . that her diseases and their effects prohibit her from even performing daily life activities and she needs to be on constant narcotic medications that do not allow her to work, even on a part time basis.

Tr. 797-98.  In his 2013 decision,

> [t]he ALJ gave Dr. Oteri's opinions "limited weight because [they were] inconsistent with the claimant's diagnostic and clinical exams," because "the records show that Dr. Oteri–Ahmadpour [was] a 'personal friend' of the claimant," and because "her opinion regarding

26

the claimant's inability to perform daily activities is not supported by the claimant's own reported daily activities."

Maynard, 2015 DNH 192, at *7 (citations to the record omitted).

Judge McCafferty determined that "[t]he ALJ's appraisal of Dr. Oteri's opinion [was] not well supported."  Id.

In his 2016 decision, the ALJ devoted a single paragraph to Dr. Oteri's May 2013 letter.  Tr. 822.  The placement of that paragraph suggests that the ALJ was evaluating Dr. Oteri's opinion on Maynard's capacity for performing work-related activities.  But the content of that paragraph – which touches on few of the relevant 20 C.F.R. § 404.1527 factors – indicates that the ALJ's primary focus was on whether Dr. Oteri's letter supported a determination that Maynard had FM that qualified as an MDI.  Rather than re-analyzing the ALJ's paragraph on Dr. Oteri's letter to determine whether the ALJ properly discounted Dr. Oteri's opinion on Maynard's capacity for performing work-related activities, the court simply notes that on remand, the ALJ should evaluate Dr. Oteri's May 2013 letter in accordance with 20 C.F.R. § 404.1527.

## IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision, doc. no. 13, is denied, and Maynard's motion to reverse that decision, doc. no. 9, is granted

to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of Court shall enter judgment in accordance with this Memorandum and Order and close the case.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


February 13, 2018

cc:   Janine Gawryl, Esq.
      T. David Plourde, Esq.